2013 UT 74

Robert H. KREJCI, Carolyn R. Krejci, Larry N. Johnson, Cindy B. Collyer, Stuart C. Collyer, Richard M. Sanford, and Marilyn A. Sanford, Petitioners,

v.

CITY OF SARATOGA SPRINGS and Lori Yates, Saratoga Springs City Recorder, Respondents,

and

Capital Assets Financial Services, Real Party in Interest.

No. 20130607.

Supreme Court of Utah.

Dec. 10, 2013.

Kevin E. Anderson, Craig M. Call, Christopher B. McCullock, Salt Lake City, for petitioners.

Kevin S. Thurman, Saratoga Springs, for respondents D. Scott Crook, Richard R. Arnold, Jr., Salt Lake City, for real party in interest.

Justice LEE, opinion of the Court:

¶ 1 This case presents an important constitutional question we recently reserved without resolving—whether site-specific rezoning is legislative action subject to referendum. *See Carter v. Lehi City*, 2012 UT 2, ¶ 75 n. 52, 269 P.3d 141. We now answer that question in the affirmative.

I

¶ 2 Capital Assets Financial Services owns approximately twelve acres of property within the City of Saratoga Springs. In 2012, Capital Assets asked the city council to rezone its property from a low density to a medium density residential zone. Capital Assets requested the rezone so that it could develop the land into seventy-seven "mansion style town homes." The city council granted the request by enacting an ordinance rezoning the twelve acres of property. In response, a group of citizens circulated a petition to reverse the ordinance. After obtaining the required signatures, the group submitted the petition to the City and requested that the issue be placed on the ballot as a referendum. The city recorder determined that the petition complied with the requirements of Utah Code section 20A–7–601 and agreed to place it on the ballot.

¶ 3 In response, Capital Assets filed a complaint against the City in the Fourth Judicial District Court. It requested a declaratory judgment that the referendum challenged an action of the city council made through its administrative (and not legislative) power. Capital Assets did not name the citizens' group as a party or serve it with process. And although the citizens had actual notice of the proceedings, they did not intervene.

¶ 4 The district court ruled in favor of Capital Assets, declaring that the site-specific zoning at issue was administrative and thus not subject to referendum. On June 4, 2013, it ordered the City to declare the petition invalid and enjoined it from placing the referendum on the ballot. The city recorder complied with the order and removed the measure from the ballot. In response, the citizens' group filed a petition under Utah Code section 20A–7–607(4)(a), which author-

izes "any voter" to apply for an extraordinary writ when a local clerk refuses to file a referendum petition.

¶ 5 Capital Assets, as a real party in interest, moved to intervene, challenging the statutory authority of petitioners to seek an extraordinary writ. And it also defended the district court's conclusion that site-specific rezoning is an administrative action that was not properly referable. The City of Saratoga Springs opted not to take a position on the merits of this question.

¶ 6 On August 23, 2013, after hearing oral argument, we issued an order granting Capital Assets' motion to intervene, granting the petition, and directing the City to place the referendum on the ballot. This opinion sets forth our reasoning for that decision.

## II

¶ 7 Capital Assets raises threshold challenges to petitioners' authority to seek an extraordinary writ. It first contends that this case falls outside the domain of the statute invoked by petitioners, Utah Code section 20A–7–607. And alternatively, it claims that petitioners lost any authority they may have had to petition for an extraordinary writ by failing to intervene in the proceeding filed by Capital Assets in the Fourth District. We reject both arguments. We find the petition procedurally proper and conclude that petitioners are not legally barred from pressing it. And we also hold that petitioners have satisfied the standards in Utah R.App. P. 19(b)(4), in that they had no other plain, speedy, or adequate remedy before them.

## A

¶ 8 By statute, "any voter" may bring a petition for an extraordinary writ when a "local clerk refuses to accept and file any referendum petition." UTAH CODE § 20A–7–607(4)(a). Capital Assets asks us to construe the statute to apply only in circumstances where the local clerk *independently* determines that the petition is legally deficient. Perhaps such a scenario is more common than the present one. But that is no reason to construe the statute to be limited to that circumstance. Here, the clerk first accepted the petition and then rejected it after the district court entered its order. The presence of a court order does not make the clerk's ultimate rejection of the petition any less of a refusal; it was still a refusal, and on that basis it must be deemed to fall under the clear terms of the statute.

¶ 9 The statute provides no exception for cases where the local clerk refuses to file the petition because she is ordered by a court to do so—or any criterion by which the basis for the refusal would be relevant. By its terms the statute applies to all refusals. We cannot append additional conditions to the statutory framework by judicial fiat.

## B

¶ 10 The decision to grant or deny a petition for extraordinary writ is discretionary. *Carpenter v. Riverton City*, 2004 UT 68, ¶ 4, 103 P.3d 127. Petitions for extraordinary writ are appropriate only where "no other plain, speedy, or adequate remedy exists." UTAH R.APP. P. 19(b)(4); *see also Carpenter*, 2004 UT 68, ¶ 4, 103 P.3d 127 ("[T]his court typically limits itself to addressing only those petitions that cannot be decided in another forum."). Thus, where "the petition is presented on hotly disputed material allegations of fact and there is no record below," it is more appropriate and practical for litigants to assert their claim in the district court. *Carpenter*, 2004 UT 68, ¶ 4, 103 P.3d 127. And where a petitioner had an opportunity to file an appeal but failed to do so, it cannot use an extraordinary writ to gain a second shot at an appeal. *Friends of Great Salt Lake v. Utah Dept. of Natural Res.*, 2010 UT 20, ¶ 23, 230 P.3d 1014 ("Before we can address a petition for extraordinary relief, the petitioning party must have exhaust[ed] all available avenues of appeal." (alteration in original, internal quotation marks omitted)). These limitations keep litigants from bypassing traditional avenues for judicial relief, or in other words from substituting the extraordinary writ process for what should have been ordinary litigation—i.e., as a remedy for self-imposed emergencies.

¶ 11 None of the above stands in the way of our hearing this petition. The petition asks us to resolve a question of law that does not depend on unresolved questions of fact. And petitioners were not parties in the district court proceeding, and thus had no opportunity for an appeal.

¶ 12 Because petitioners failed to intervene in the district court proceedings, and thus have no standing to appeal, Capital Assets insists that they should likewise be foreclosed from pressing the matter on an extraordinary writ. We see the matter differently. We see no basis for a hard-and-fast rule requiring intervention as a prerequisite to the filing of a petition for extraordinary writ. The governing standard is Utah R.App. P. 19(b)(4), which calls for a showing that "no other plain, speedy, or adequate remedy exists." And that flexible standard leaves room for a decision to forgo intervention, while subsequently seeking an extraordinary writ, in the circumstances of this case.

¶ 13 *Society of Professional Journalists v. Bullock*, 743 P.2d 1166 (Utah 1987), is not to the contrary. In that case, a group of journalists had participated in the underlying criminal proceedings by requesting transcripts of closed hearings. *Id.* at 1170. When those arguments failed, and the hearings were ordered closed, the journalists brought an extraordinary writ to challenge the propriety of the closure order. *Id.* at 1169. Because the petitioners in that case were involved in the lower court proceedings, we acknowledged the potential for the extraordinary writ process to be abused as a tool for circumventing a traditional appeal. *Id.* at 1171 ("[T]he fact that a writ can be used to obtain appellate-type review of a lower tribunal's ruling raises a concern that no party be advantaged insofar as standing is concerned by reason of having petitioned this Court for a writ rather than having proceeded by way of appeal."). And we noted that this problem was exacerbated by the fact that a party who did not have standing to appear in the district court could potentially use an extraordinary writ to gain appellate-like review of the district court's rulings. *Id.* In these circumstances, we held that an extraordinary writ "in the nature of an appeal"

could not be advanced absent a showing of "appellate standing." *Id.*

¶ 14 This case does not fit the mold of *Society of Professional Journalists*. Petitioners in this case were not involved in the district court proceedings; their extraordinary writ is accordingly not "in the nature of an appeal." The order they seek from us may have the potential to conflict with (and invalidate) the order entered by the district court, but their petition to us does not directly challenge the order. Nor could it. As outsiders to the district court proceeding, petitioners were neither bound by nor entitled to appeal from an order entered in the case between Capital Assets and Saratoga Springs. Instead, as a non-party, petitioners were free to pursue their own independent suit on the issue.

¶ 15 Our liberal joinder rules afford ample discretion to the parties—to choose amplified litigation involving multiple claims and multiple parties, or to opt instead for a narrower suit involving fewer claims and fewer parties. Thus, the joinder decision is generally permissive. *See* UTAH R. CIV. P. 19, 20, 24. Parties are generally free to litigate in a piecemeal fashion if they so choose. Absent a motion for joinder of a necessary party, our rules leave joinder and intervention up to the discretion of litigants. And if an outsider is not joined in an action, it is not bound by the judgment and not precluded from filing a separate proceeding to resolve the same or similar issues.

¶ 16 These principles sustain petitioners' standing before us, and foreclose Capital Assets' argument that their failure to intervene bars their pressing the matter further. No rule of preclusion forecloses outsiders not joined in a proceeding (and not in privity with someone who was joined) from having their own day in court. Indeed, any provision for such preclusion would run afoul of a core principle of due process. *See Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (due process requires that "litigants ... who never appeared in a prior action ... may not be collaterally estopped without litigating the issue"). Outsiders like petitioners are free to file their own separate

suit. They are thus likewise free to seek relief via a petition for extraordinary relief—subject to the standards for issuance of such a writ. *See* UTAH R.APP. P. 19(b)(4).

¶ 17 As Capital Assets indicates, petitioners *could have* intervened in the district court proceedings. But we do not view the forgone prospect of intervention as a "plain, speedy, or adequate remedy." Granted, petitioners did not seek to intervene. But neither did Capital Assets seek to join them—a move that could have required an appeal, and thus foreclosed an extraordinary writ petition.

¶ 18 Under the circumstances, moreover, petitioners' decision to sit on the sidelines was both strategically and economically defensible. Throughout the district court proceedings, the City vigorously defended the referability of the site-specific rezoning decision. And with that in mind, petitioners understandably saw no reason to expend their own resources to intervene and advance that same position.

¶ 19 The landscape changed when the district court ruled against the City and the City declined to appeal. From that point forward, petitioners were, for the first time, in a position where they had to act in order to protect their interests. Since they were not parties to the original action, they could not appeal. And as noted above, they were free to bring an independent action in the district court, seeking a contrary order. But the extraordinary writ provision in Utah Code section 20A–7–607(4)(a) provided an alternative method of relief.

¶ 20 If the district court's order had been entered in time for petitioners to file in the district court instead, we might then have exercised our discretion to require that petitioners use that "plain, speedy, [and] adequate remedy." But because the need to seek relief occurred so shortly before the ballot decision would have to be made, a new proceeding in the district court was not a "speedy" or "adequate" remedy.[1] At the point in the proceedings where the petitioners knew they were required to act, this petition was their only reasonable alterna-tive. We therefore conclude that the extraordinary writ statute applies to petitioners, and that hearing that writ is a proper exercise of our discretion.

## III

¶ 21 Article VI of the Utah Constitution vests legislative power in the people, to be exercised by petition for ballot initiatives and referenda. *Carter v. Lehi City,* 2012 UT 2, ¶ 17, 269 P.3d 141. That power is limited to actions constituting "a valid exercise of legislative rather than executive or judicial power." *Id.* ¶ 18. Thus, when a city council exercises its legislative authority, voters retain the constitutional prerogative of challenging its decisions by referendum. But where the city council is acting pursuant to its administrative authority, the voters have no such right.

¶ 22 The central issue in this case is whether the site-specific rezoning of Capital Assets' property was a legislative or an administrative act. Because site-specific zoning effectively establishes a new law, and does not just implement one already in existence, we deem it a legislative act. We base that conclusion on the notion that rezoning requires the weighing of broad, competing policy considerations and results in a law of general applicability. And we accordingly hold that the referendum petition submitted by petitioners was properly referable under the constitution, and should thus have been accepted by the city recorder for placement on the ballot.

### A

¶ 23 By statute, Utah voters are authorized to pursue a petition for a law "to be submitted to . . . a vote of the people if it is a local law." UTAH CODE § 20A–7–102. A "local law" is statutorily defined as "an ordinance, resolution, master plan, and any comprehensive zoning regulation adopted by ordinance or resolution," but "individual property zoning decision[s]" are excluded. *Id.* § 20A–7–101(12).

---

1. The district court issued its order on June 4, 2013. Any contrary order would have to have been entered before the end of August, when the City needed to finalize the ballot.

¶ 24 As Capital Assets indicates, site-specific rezoning decisions are statutorily ineligible for referendum under the terms of this provision. But the people's power to legislate is not a creature of statute. It is inherent power—authority reserved by the people in our constitution. *Carter*, 2012 UT 2, ¶ 83, 269 P.3d 141. So the legislature's failure to delegate referendum power is not the end of the inquiry. We must proceed to consider the question whether the legislature's regulation overrides the people's authority as reserved in the constitution. And if it does, it is the people's constitutional prerogative that must control.

¶ 25 The constitutional question turns on the distinction between legislative authority on one hand and administrative or executive power on the other. That is the sum and substance of our inquiry. If the site-specific zoning decision at issue is legislative in nature, then the matter is properly referable—regardless of any statutory determination to the contrary.

### B

¶ 26 Our *Carter* opinion clarified the standards dictating the scope of the people's legislative power. It started with the proposition that "legislative power gives rise to a new law, while executive power implements a law already in existence." *Carter*, 2012 UT 2, ¶ 57, 269 P.3d 141 (internal quotation marks omitted). And it articulated the core hallmarks of legislative power: "Legislative power generally (a) involves the promulgation of laws of general applicability; and (b) is based on the weighing of broad, competing policy considerations." *Id.* ¶ 34.

¶ 27 In *Carter* we flagged but did not resolve the question whether site-specific zoning decisions were legislative or administrative. *Id.* ¶ 75 n. 52. In so doing, we acknowledged that site-specific rezoning presented the "classic hard case" under the above-quoted standard, in that it seems to bear some hallmarks of administrative action (for example, in that it affects only one party), but bears other indications of legislative power (in that it runs with the land and "often involve[s] the kind of decisionmaking that is the essence of legislating—a balancing

of policy and public interest factors"). *Id.* ¶ 72 (internal quotation marks omitted). We accordingly reserved the question for a day "in which the issue is squarely presented and fully briefed." *Id.* ¶ 75 n. 52. That day arrived upon the filing of this case.

¶ 28 *Carter* articulated two bright-line rules for marking certain decisions as conclusively legislative as a matter of law. First, we indicated that decisions made by a governmental body possessing "only legislative power" are conclusively legislative. *Id.* ¶¶ 73, 75. And second, we held that the adoption of a broad zoning ordinance or a new zoning classification would also be a conclusively legislative act. *Id.* ¶¶ 71, 74. Neither of those bright lines is implicated here. Saratoga Springs has a six-member council, which "jointly exercises both legislative and executive powers over the municipality." And both the R–3 and R–6 classification "already existed as part of the City Code at the time Capital Assets submitted its rezone application."

¶ 29 Capital Assets cites the lack of any bright-line basis for treating the rezoning decision at issue here as legislative as a ground for denominating it administrative. But that misapprehends the nature of our analysis in *Carter*. The bright-line rules in *Carter* were aimed at clarifying the grounds for resolving easy cases, not for marking the outer bounds of the people's constitutional power in the hard ones. To do that we must return to the general definition of the legislative power and to the hallmarks of legislative authority cited in *Carter*. *Id.* ¶ 34.

¶ 30 In two prior decisions, we have denominated site-specific rezoning as administrative and therefore non-referable. *See Bird v. Sorenson*, 16 Utah 2d 1, 394 P.2d 808 (1964); *Wilson v. Manning*, 657 P.2d 251 (Utah 1982). But the cited cases are based on standards and considerations that were repudiated in *Carter*. 2012 UT 2, ¶ 75 n. 52, 269 P.3d 141 ("[W]e repudiate ... the legal standard applied in *Wilson* and *Bird*...."). *Bird*, for example, cited the court's concerns for efficient administration of municipal government. 394 P.2d at 808. *Wilson* reiterated that point while also noting the insignifi-

cance of the variation between the challenged decision and an earlier municipal ordinance. 657 P.2d at 254. But both of these considerations were thoroughly repudiated in *Carter*. 2012 UT 2, ¶ 64, 269 P.3d 141 ("The power of the people to legislate by initiative does not depend on the degree to which the people may wish to depart from existing law or on the proposed initiative's consistency with the general policy of existing law. Nor does it turn on a judicial assessment of the people's capacity to comprehend or efficiently legislate on a particular matter."). So *Bird* and *Wilson* are unhelpful in resolving the question presented. To decide the matter we must return to the first principles articulated in *Carter*.

### C

¶ 31 The chief hallmarks of legislative action under *Carter* are the adoption of rules of general applicability and the "weighing of broad, competing policy considerations." *Carter*, 2012 UT 2, ¶ 34, 269 P.3d 141. Site-specific zoning fits both of these criteria.

¶ 32 We acknowledged in *Carter* that site-specific zoning decisions "affect only one piece of property." *Id.* ¶ 72. Thus, they are not generally applicable in the sense that they "do not result in the announcement of a rule that applies generally to other pieces of property." *Id.* But they *are* generally applicable in a more important sense, in that they apply "to all present and future parties that meet its terms." *Id.* We conclude that this is the appropriate formulation of "general applicability." Any future owner of the re-zoned property would be subject to the new zoning classification. And in this particular case, Capital Assets plans to develop the property into seventy-seven individual residential units. All future owners would be bound by the decision to rezone the property. Therefore, we conclude that site-specific rezoning creates a generally applicable law.

¶ 33 That said, general applicability, standing alone, does not compel the conclusion that a certain action is legislative. We must also evaluate whether the action in question implicates the weighing of broad, competing policy considerations. *Id.* ¶ 34. Reference to established analogies—deci-

sions granting variances and conditional use permits—helps to illustrate this distinction. In *Carter*, we treated those decisions as administrative. *See id.* ¶ 71. We reached that conclusion even though they, like site-specific rezoning, are often generally applicable in that they "run with the land" and apply equally to present and future owners of the property.

¶ 34 The analogy between rezoning, on one hand, and variances and conditional use permits, on the other, breaks down on further scrutiny. Variances and conditional use permits are fundamentally administrative acts because they involve application of existing law to the facts presented by an individual applicant. And the decision on variances and conditional use permits is limited to the evaluation of specific criteria fixed by law. A rezoning decision, by contrast, is open-ended. No fixed criteria are required to be met as a prerequisite for a rezone. Any and all considerations are on the table, such that rezoning decisions are made by "consider[ing] the wide range of policy considerations of relevance to all who fall within the scope of a particular law." *Id.* ¶ 38.

¶ 35 A "conditional-use" or "special-use" permit is an "authorization to use property in a way that is identified as a special exception in a zoning ordinance." BLACK'S LAW DICTIONARY 1527 (9th ed.). "Unlike a variance, which is an authorized violation of a zoning ordinance, a special-use permit is a permitted exception." *Id.; see also* UTAH CODE § 10–9a–507(1) ("A land use ordinance may include conditional uses and provisions for conditional uses that require compliance with standards set forth in an applicable ordinance."). So in the conditional use context, the exception to zoning requirements is anticipated in the zoning ordinance itself, with the ordinance setting forth conditions that must be met in order for a property owner to qualify for an exception. Thus, if an applicant meets the standards in the ordinance, the permit "shall" be approved. *Id.* § 10–9a–507(2). So when a conditional use permit is approved, no new law is created. Instead, existing law has been applied to the particular facts presented by the applicant. That is the essence of administrative—not legislative—action.

¶ 36 Similar considerations are in play in the decision whether to grant a variance. To qualify for a variance, the applicant bears the burden of establishing the following:

(i) literal enforcement of the ordinance would cause an unreasonable hardship for the applicant that is not necessary to carry out the general purpose of the land use ordinances;

(ii) there are special circumstances attached to the property that do not generally apply to other properties in the same zone;

(iii) granting the variance is essential to the enjoyment of a substantial property right possessed by other property in the same zone;

(iv) the variance will not substantially affect the general plan and will not be contrary to the public interest; and

(v) the spirit of the land use ordinance is observed and substantial justice done.

UTAH CODE § 10–9a–702(2)(a). Unless an applicant proves all of these elements, a variance may not be approved. Thus, as with conditional use permits, the decision involves a determination whether the particular circumstances of an applicant are sufficient to meet the statutory standard. And again, such application of law to facts is not legislative action.

¶ 37 A site-specific rezoning decision, by contrast, does not involve an application of existing law to a new set of facts. It involves the establishment of new law out of whole cloth. Such a decision is unconstrained by statutory requirements. No showing that "the spirit of the [previous] land use ordinance is observed" is required, for example. See UTAH CODE § 10–9a–702(2)(a)(v). The municipality is free to amend its zoning requirements in a fundamental way. Or in a merely minor fashion. The question is a matter of legislative policymaking.

¶ 38 Rezoning is fundamentally different from the matter of granting a variance or a conditional use permit. It creates a generally applicable law and calls for the broad weighing of all relevant public policy considerations. And on that basis we deem site-specific rezoning a legislative act—and thus subject to referendum. Our contrary decisions in *Bird v. Sorenson,* 16 Utah 2d 1, 394 P.2d 808 (1964), and *Wilson v. Manning,* 657 P.2d 251 (Utah 1982), are accordingly overruled.

## IV

¶ 39 We uphold the procedural propriety of the extraordinary writ petition that is before us in this case. We also find the site-specific rezone of Capital Assets' property a legislative matter, and thus subject to referendum. It is on this basis that we have granted the petition for extraordinary writ and ordered the Saratoga Springs city recorder to place the referendum that is the subject of the petition on the November 2013 ballot.

Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice DURHAM, and Justice PARRISH joined.